21-2443-cv
*Local Union 97, Int'l Bhd. of Elec. Workers, AFL-CIO v. Niagara Mohawk Power Corp.*

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

———

August Term 2022

(Argued:  October 11, 2022     Decided:  May 3, 2023)

Docket No. 21-2443-cv

———

LOCAL UNION 97, INTERNATIONAL BROTHERHOOD
OF ELECTRICAL WORKERS, AFL-CIO,

*Plaintiff-Appellee,*

*v.*

NIAGARA MOHAWK POWER CORPORATION, D/B/A NATIONAL GRID,

*Defendant-Appellant.*

———

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

———

Before:     LEVAL, CHIN, and LEE, *Circuit Judges.*

———

Appeal from a judgment of the United States District Court for the

Northern District of New York (D'Agostino, *J.*) granting plaintiff-appellee's

motion to compel arbitration and denying defendant-appellant's motion for summary judgment. Plaintiff-appellee is a labor organization that, for over two decades, has entered into a series of collective bargaining agreements with defendant-appellant, an electric and natural gas utility. Plaintiff-appellee filed a grievance objecting to defendant-appellant's refusal to provide health insurance benefits to retired employees, as purportedly required under the collective bargaining agreement in force at the time the grievance was filed. Defendant-appellant refused to consider the grievance or to proceed to arbitration. Plaintiff-appellee brought this action in district court, requesting that the district court (1) find that defendant-appellant had breached the agreement by refusing to arbitrate the grievance and (2) compel arbitration. The district court granted plaintiff-appellee's motion to compel arbitration.

AFFIRMED.

———————————

BRIAN J. LACLAIR, Syracuse, NY, *for Plaintiff-Appellee*.

ROBERT A. LABERGE (Hannah K. Redmond, *on the brief*), Syracuse, NY, *for Defendant-Appellant*.

———————————

2

PER CURIAM:

This case requires us to decide whether the grievance-and-arbitration provision of the parties' collective bargaining agreement covers a dispute about the medical insurance benefits that, according to plaintiff-appellee Local Union 97, International Brotherhood of Electrical Workers, AFL-CIO (the "Union"), defendant-appellant Niagara Mohawk Power Corporation (the "Company") agreed to provide to certain retired employees, former members of the Union. Because we hold that the agreement covers the dispute, we AFFIRM the judgment of the district court compelling arbitration. In explaining this result, we clarify the law of this Circuit regarding disputes about the interpretation of arbitration clauses in collective bargaining agreements.

## STATEMENT OF THE CASE

I.      *The Facts*

The Company, which does business as National Grid, is an electric and natural gas utility that operates throughout New York State. The Union is the exclusive collective bargaining representative for the Company's some 3,200 employees. Employees represented by the Union are organized into two bargaining units, each of which has a collective bargaining agreement with the

3

Company.  This appeal concerns the larger of the bargaining units, whose agreement with the Company is colloquially known as the "Blue Book."

The "Blue Book" collective bargaining agreement (the "Agreement") initially came into force October 1, 2004.  As adopted, the Agreement was to run through March 31, 2013, but the Company and the Union agreed to extend it on several occasions.  On February 19, 2020, the date the grievance at issue in this appeal was filed, the Agreement had been extended for the period running from April 1, 2017, through March 28, 2020.  Although the memorandum in which the parties agreed to this extension amended certain provisions of the Agreement, it left unchanged the provisions at issue in this appeal.  The memorandum extending the Agreement expressly provided that "[a]ny dispute under this Agreement is subject to resolution exclusively in accordance with the Grievance and Arbitration procedure contained in Article XXII of the Existing Agreement."  J. App'x at 242.[1]

Article XXII of the Agreement contains a procedure for addressing grievances.  The preamble to its first section states:

---

[1]     The parties subsequently renewed the Agreement for a further term, running from March 29, 2020, through March 31, 2023.  No provisions of the Agreement relevant to this appeal were amended, and the parties again expressly reaffirmed the existing grievance-and-arbitration provision.  *See* J. App'x at 272.

> Should [the Union] claim that a dispute or difference has arisen between the Company and [the Union] as to the meaning, application or operation of any provision of this Agreement, such dispute or difference shall be presented within thirty (30) working days of when the event or action upon which the grievance is based became known, or should have been known by the grievant, and settled in the following manner.

*Id.* at 70.[2]  The article lays out a four-step process.  *See id.* at 70-71.  Step 1 provides for a meeting between a steward or Union representative and the relevant supervisor; if that meeting is unsuccessful, "the aggrieved Employee or the Employee's steward and/or [Union] representative shall furnish a written statement of the grievance" to the supervisor.  *Id.* at 70.  If the dispute is not resolved at Step 1, at Step 2 the grievance is to be considered at a meeting "between a member or members of the Grievance Committee designated by [the Union] and the Manager-Labor Relations or designee who will decide the matter."  *Id.*  Step 3 calls for a "hearing . . . between a three (3) member committee of [the Union] and a three (3) member committee of the Company, who will decide the matter" and whose "decision . . . shall be final and binding upon the

---

[2]      This provision is substantively identical to the grievance-and-arbitration provision another panel of this Court considered in *Loc. Union 97, Int'l Bhd. of Elec. Workers, AFL-CIO v. NRG Energy, Inc.*, 53 F.4th 42, 47 (2d Cir. 2023) ("*NRG Energy*"). That panel concluded that the grievance at issue in that appeal, which concerned life insurance benefits for retirees, was subject to arbitration. *Id.* at 53.

parties." *Id.* If the Step 3 hearing does not result in a decision, the Union may, after giving the Company written notice, "refer the dispute to arbitration," which takes place at Step 4. *Id.* at 71. The Agreement includes numerous provisions about grievances that are referred to arbitration, addressing matters such as the selection of the arbitrator, the possibility of settlement, access to a forum for alternative dispute resolution, and the allocation of costs.

Only the first step of the process envisions -- though it does not require -- the direct involvement of an aggrieved employee. In addition, a later section of Article XXII provides that the Union may initiate a grievance on behalf of a member who claims wrongful discharge from employment with the Company. Such a grievance starts the process at Step 2.

On February 19, 2020, Daniel Machold, the Union's business representative and a Company employee, filed the grievance that gave rise to this case. He submitted the grievance on a form bearing the Company's logo, indicating that "Local 97," that is, the Union, was the grievant; "All" was the grievant's department; "System" was the grievant's work site; and Article XX, section 6(b) was the "Provision of the Labor Agreement in Dispute." *Id.* at 274. The body of the grievance stated: "The Company is subjecting post-65 retirees to

6

a greater out-of-pocket maximum spend than active employees in violation of the above cited article. Make all affected grievants whole." *Id.*

Article XX of the Agreement is entitled "Employee Benefits," and section 6 of the article is entitled "Post-Retirement Medical and Life Insurance." *Id.* at 52, 58. Specifically, the grievance charged that the Company violated section 6(b)(ii)(1), which provides that "[a]t retirement, eligible retirees will continue to participate in medical plans identical to those that are offered to active Employees and as modified for active Employees subsequent to their retirement date." *Id.* at 58.

Without denying that the health insurance plan available to retirees had a greater out-of-pocket maximum than the plan for current employees, the Company declined to process the grievance Machold filed. In correspondence between Company and Union personnel over a period of approximately six months, the Company gave two reasons for refusing to process the grievance: first, that the Union does not represent and the Agreement does not cover retired employees, and, second, that the grievance is not arbitrable. On September 30, 2020, the Union submitted to the Company a "Retiree Representation Authorization Form" signed by John McAuliffe, a retired employee of the

7

Company who authorized the Union "to take any action the Union deems necessary to enforce my rights and interests under any applicable collective bargaining agreement or other contract." *Id.* at 282.

## II. Proceedings Below

On October 9, 2020, the Union filed its Complaint in the district court, requesting that the district court (1) find that the Company breached the Agreement by refusing to arbitrate the grievance and (2) compel arbitration. The Company answered the Complaint on December 8, 2020.

On April 5, 2021, the Union filed a motion to compel arbitration pursuant to section 301(a) of the Labor Management Relations Act, 29 U.S.C. § 185(a). The same day, the Company filed a motion for summary judgment dismissing the Complaint. On August 25, 2021, the district court granted the Union's motion to compel arbitration, denied the Company's motion for summary judgment, and ordered that the case be closed. *Loc. Union 97, Int'l Bhd. of Elec. Workers, AFL-CIO v. Niagara Mohawk Power Corp.*, No. 20-CV-1249, 2021 WL 3771877, at *7 (N.D.N.Y. Aug. 25, 2021). Judgment issued that day.

This appeal followed.

8

*DISCUSSION*

We have jurisdiction to review the district court's order compelling

arbitration because, as the parties agree, the order and associated judgment

"end[ed] the litigation on the merits and le[ft] nothing more for the court to do

but execute the judgment." *Green Tree Fin. Corp.-Alabama v. Randolph*, 531 U.S. 79,

86 (2000) (quoting *Digital Equip. Corp. v. Desktop Direct, Inc.*, 511 U.S. 863, 867

(1994)). Thus, there is a "final decision with respect to an arbitration," appellate

review of which the Federal Arbitration Act permits. 9 U.S.C. § 16(a)(3).

We review *de novo* a district court's decision to compel arbitration.

*See Cohen v. UBS Fin. Servs., Inc.*, 799 F.3d 174, 177 (2d Cir. 2015) (citation

omitted). "The determination of whether parties have contractually bound

themselves to arbitrate is a legal conclusion also subject to *de novo* review." *Meyer*

*v. Uber Techs., Inc.*, 868 F.3d 66, 72-73 (2d Cir. 2017) (citation omitted). We review

for clear error any factual findings on which the district court relied in reaching

its decision about arbitrability. *Id.* at 73.

9

## I. Applicable Law

### A. Arbitrability

"It is well settled in both commercial and labor cases that whether parties have agreed to submit a particular dispute to arbitration is typically an issue for judicial determination." *Granite Rock Co. v. Int'l Bhd. of Teamsters*, 561 U.S. 287, 296 (2010) (citations and internal quotation marks omitted).

In *Granite Rock*, the Supreme Court clarified "the proper framework for deciding when disputes are arbitrable." *Id.* at 297. The Court held that "a court may order arbitration of a particular dispute only where the court is satisfied that the parties agreed to arbitrate *that dispute*." *Id.* (citations omitted). Because "'arbitration is a matter of contract[,]' . . . . 'arbitrators derive their authority to resolve disputes only because the parties have agreed in advance to submit such grievances to arbitration.'" *Id.* at 296 (quoting *AT&T Techs., Inc. v. Commc'ns. Workers of Am.*, 475 U.S. 643, 648-49 (1986)). Ordinary principles of contract law guide the inquiry into whether an arbitration agreement was validly formed and whether the parties consented to arbitrate a particular dispute. *Id.* at 296; *accord M & G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015); *CNH Indus. N.V. v. Reese*, 138 S. Ct. 761, 763-65 (2018) (per curiam).

10

While acknowledging there is a "'federal policy favoring arbitration'" of labor disputes, *Granite Rock*, 561 U.S. at 302 (quoting *Gateway Coal Co. v. Mine Workers*, 414 U.S. 368, 377 (1974)), the Supreme Court warned that courts should not "use policy considerations as a substitute for party agreement," *id.* at 303. Instead, the Court restated "the first principle that underscores all of our arbitration decisions:  Arbitration is strictly 'a matter of consent.'"  *Id.* at 299 (quoting *Volt Info. Scis., Inc. v. Bd. of Trs. of Leland Stanford Junior Univ.*, 489 U.S. 468, 479 (1989)).  A court may only compel arbitration where it is "satisfied that neither the formation of the parties' arbitration agreement *nor* . . . its enforceability or applicability to the dispute is in issue."  *Id.*

In the narrow set of circumstances where a court finds that the parties have entered into a valid and enforceable agreement to arbitrate, but the agreement is "ambiguous about whether it covers the dispute at hand," the court may apply a "presumption of arbitrability."  *Id.* at 301.  The presumption, however, is rebuttable and "simply assists in resolving arbitrability disputes."  *Id.* at 302.

At bottom, *Granite Rock* stands for the proposition that courts may invoke a presumption of arbitrability only where the parties' dispute concerns a

11

valid and enforceable agreement to arbitrate that is ambiguous as to its scope.  In so holding, the Supreme Court abrogated some elements of this Court's previous arbitrability jurisprudence.

In a line of cases decided prior to *Granite Rock*, we developed a two-step framework for determining whether a district court should compel arbitration -- the framework on which, as we describe below, the district court in this case relied.  We directed that a court should first "'classify the particular [arbitration] clause as either broad or narrow." *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 172 (2d Cir. 2004) (quoting *Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc.*, 252 F.3d 218, 224 (2d Cir. 2001)).  A broad clause is one that "purport[s] to refer to arbitration all disputes arising out of a contract," whereas a narrow clause "limit[s] arbitration to specific types of disputes." *Oldroyd v. Elmira Sav. Bank, FSB*, 134 F.3d 72, 76 (2d Cir. 1998) (citing *McDonnell Douglas Fin. Corp. v. Penn. Power & Light*, 858 F.2d 825 (2d Cir. 1988)), *abrogated on other grounds by Katz v. Cellco P'ship*, 794 F.3d 341 (2d Cir. 2015); *see also Louis Dreyfus Negoce*, 252 F.3d at 224.

The second step of the analysis depended on whether the clause was broad or narrow.  Our Court explained:  "We think making a distinction between

12

broad and narrow arbitration clauses is necessary and sound, as the scope of an arbitration clause, like any contract provision, is a question of the intent of the parties." *Louis Dreyfus Negoce*, 252 F.3d at 225 (citation and internal quotation marks omitted). We added: "Where the arbitration clause is broad, 'there arises a presumption of arbitrability' and arbitration of even a collateral matter will be ordered if the claim 'implicates issues of contract construction or the parties' rights and obligations under it.'" *Id.* at 224 (citation omitted). In contrast, we explained, "[w]here the arbitration clause is narrow, a collateral matter will generally be ruled beyond its purview." *Id.* (citation omitted).

Although these cases, like *Granite Rock*, rest on the principle that arbitration is a matter of consent, they are inconsistent with *Granite Rock* to the extent they direct courts to prioritize deciding whether a presumption of arbitrability applies before determining whether, under ordinary principles of contract interpretation, a particular dispute is covered by the language to which the parties agreed. Under *Granite Rock*, the presumption of arbitrability is a court's last, rather than first, resort. This is because, as the Supreme Court cautioned, to presume that a dispute is arbitrable because an arbitration clause is

framed broadly runs the risk of requiring parties to arbitrate disputes they did not consent to be arbitrated. *See* 561 U.S. at 298-99.

Some of the cases this Court has decided after *Granite Rock* have nonetheless adhered to vestiges of our pre-*Granite Rock* framework that are not inconsistent with *Granite Rock*.[3] In *Holick v. Cellular Sales of N.Y., LLC*, 802 F.3d 391, 395 (2d Cir. 2015), for instance, we acknowledged that "arbitration is a matter of contract, and therefore a party cannot be required to submit to arbitration any dispute which it has not agreed so to submit." *Id.* (quoting *JLM Indus.*, 387 F.3d at 171). But we also described a "presumption of arbitrability" that can "only [be] overcome if it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute. Doubts should be resolved in favor of coverage." *Id.* (quoting *Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Intern., Inc.*, 198 F.3d 88, 99 (2d Cir. 1999)). Of

---

[3] Such cases are outnumbered by those in which we have applied *Granite Rock*. *See, e.g.*, *LAVVAN, Inc. v. Amyris, Inc.*, No. 21-1819, 2022 WL 4241192, at *3 (2d Cir. Sept. 15, 2022) (summary order); *Cooper v. Ruane Cunniff & Goldfarb, Inc.*, 990 F.3d 173, 179 (2d Cir. 2021); *Lloyd v. J.P. Morgan Chase & Co.*, 791 F.3d 265, 270 (2d Cir. 2015) ("The presumption [of arbitrability] may tip the scale if an agreement is truly ambiguous, but it does not alter the controlling question: is the arbitration agreement 'best construed to encompass the dispute'?" (citation omitted)).

14

course, to the extent that decisions of this Court are inconsistent with the Supreme Court's holdings in *Granite Rock*, those decisions cannot be good law.[4]

## B. Contractual Agreements Involving Retiree Benefits

Although retired employees may not be members of a bargaining unit under the National Labor Relations Act, employers may contractually obligate themselves to provide benefits to retired employees. *See United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union,*

---

[4] Indeed, one nonprecedential summary order of this Court, decided after *Granite Rock*, has held that "[s]o long as the arbitration clause is 'broad' and not explicitly limited to certain matters, it should be read to cover every dispute that it does not explicitly exclude." *Goodrich Pump & Engine Control Sys., Inc. v. Int'l Union United Auto. Aerospace & Agric. Implement Workers of Am. & Amalgamated Local 405*, 723 F. App'x 67, 69 (2d Cir. 2018) (summary order). For this proposition, the summary order cited *Litton Financial Printing Division v. NLRB*, 501 U.S. 190, 209 (1991), which observed that "where an effective bargaining agreement exists between the parties, and the agreement contains a broad arbitration clause, there is a presumption of arbitrability in the sense that [a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *Id.* at 209 (citations and internal marks omitted). *Goodrich Pump* did not acknowledge *Granite Rock*. In a footnote in *Granite Rock*, however, the Supreme Court stated that it was a misreading of its prior cases to impose "a presumption that labor disputes are arbitrable whenever they are not expressly excluded from an arbitration clause." 561 U.S. at 301 n.8. Therefore, *Goodrich Pump* applied the wrong legal standard. We note that a recent panel of this Court applied the Circuit's framework without addressing *Granite Rock*. *See NRG Energy*, 53 F.4th at 46, 50-53 (applying a presumption of arbitrability and finding that the employer failed to overcome it, under our pre-*Granite Rock* framework, but also explaining that "ordinary principles of contract law require us to hold the parties to the strict language of the arbitration clause which demands arbitration whenever Local Union 97 claims there is a dispute or difference over any provisions").

*AFL-CIO/CLC v. Cookson Am., Inc.*, 710 F.3d 470, 475 (2d Cir. 2013). "Where employers have undertaken such contractual obligations, 'accepted contract principles' indicate that a 'union has a legitimate interest in protecting the rights of the retirees and is entitled to seek enforcement of the applicable contract provisions.'" *Id.* (quoting *United Steelworkers of Am. v. Canron, Inc.*, 580 F.2d 77, 80-81 (3d Cir. 1978)). Therefore, where an employer refuses to provide benefits to retired employees, the union that negotiated with the employer for those benefits may bring a grievance or sue because the "refusal . . . will injure the Union by depriving it of the benefit of its bargain." *Id*.

## II. *Application*

### A. *The District Court's Approach*

Although the district court discussed *Granite Rock*, in the heart of its opinion it applied tests drawn from our pre-*Granite Rock* jurisprudence that are not consistent with *Granite Rock*'s teaching. The district court began, "[f]irst," by asking "whether the arbitration clause is broad or narrow." *Loc. Union 97*, 2021 WL 3771877, at *5 (citation omitted). It decided that the clause is "a classic example of a broad clause." *Id.* at *6 (citation and internal quotation marks omitted). The district court reasoned that the Agreement's use of the word

16

"Employee" is, "at best," ambiguous and "does not shrink the size of the arbitration clause. Instead, such a dispute over whether a certain grievance is within the purview of a broad arbitration clause is exactly when the presumption of arbitrability applies." *Id.* Quoting *Goodrich Pump*, the district court held that the Company "must rebut the presumption with evidence . . . that the dispute was 'explicitly excluded' from the arbitration procedure." *Id.* (alteration adopted) (quoting 723 F. App'x at 69). The district court found there was no such exclusion. *Id.*

The district court's analysis is inconsistent with *Granite Rock*. Rather than finding that the Agreement's arbitration clause is ambiguous in scope before applying the presumption of arbitrability, the district court started by characterizing the arbitration clause itself and held that the presumption of arbitrability applied, without determining whether the Agreement covered the parties' dispute. Moreover, while *Granite Rock* indicates that the presumption of arbitrability is rebuttable, that ruling specifically rejected the proposition, relied on by the district court here, that the presumption can only be rebutted by evidence the parties expressly excluded a particular topic from arbitration. *See* 561 U.S. at 301 n.8 (warning that although previous decisions "contain[] language

17

that might in isolation be misconstrued as establishing a presumption that labor disputes are arbitrable whenever they are not expressly excluded from an arbitration clause," in fact "courts must construe arbitration clauses because a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit" (internal citation and quotation marks omitted)).

While the district court's reasoning was faulty, it reached the correct conclusion. On *de novo* review, we hold that the Union's grievance is subject to the grievance and arbitration process the parties agreed to follow.

### B. *Arbitrability of the Grievance*

Applying *Granite Rock*, we begin with the fact that the parties agree the Agreement is properly formed and generally enforceable. At issue is only whether the grievance-and-arbitration provision, Article XXII, covers the parties' dispute about retiree health benefits.

Both the Company and the Union assert that, as a matter of contract interpretation, this case is "clear," Appellant's Br. at 28, and "straightforward," Appellee's Br. at 20. But as to whether the provision covers the Union's grievance, the parties take it to mean nearly opposite things. We agree with the Union that Article XXII unambiguously covers the grievance. Because the

18

article's scope is not ambiguous, we need not -- and indeed, may not -- apply a presumption of arbitrability.

As a textual matter, the preamble to Article XXII(1) indicates that the grievance and arbitration process is available "[s]hould" the Union "claim that a dispute or difference has arisen between the Company and [the Union] as to the meaning, application[,] or operation of any provision of this Agreement." J. App'x at 70. The provision's applicability is thus contingent on two conditions: first, that the Union claims a dispute has arisen and, second, that the dispute concerns a provision of the Agreement.[5]

The record in this case reveals that both conditions were fulfilled. It is self-evident that the Union has claimed a dispute has arisen. The Company contends the dispute does not concern "this Agreement" because the retirees whom the Union's grievance seeks to benefit retired when earlier iterations of the Agreement were in effect. Appellant's Br. at 32; J. App'x at 70. The Union's grievance does concern the Agreement, however, because the Union's allegation is that the Company provided retirees with a less generous medical insurance

---

[5]     The panel in *NRG Energy*, interpreting a substantially similar provision, aptly observed that "the language of the arbitration clause permits Local Union 97 to arbitrate whenever the union *merely claims* there is a dispute or difference over any provision of the [collective bargaining agreement]." 53 F.4th at 52.

19

plan than that guaranteed in Article XX(6)(b)(ii)(1), which the parties ratified anew each time they agreed to extend the Agreement's term.

The Company's other arguments are equally unavailing. First, the Company contends that Article XX, which relates to employee benefits, and Article XXII, the grievance-and-arbitration provision, concern only current employees. Although the Company is right that the bulk of Article XX describes benefits it agreed to provide current employees, the title of the specific section to which the Union's grievance pertains is "Post-Retirement Medical and Life Insurance." J. App'x at 58. The section stretches over nearly two pages of the Agreement and contains detailed provisions about retirees' eligibility for benefits, the scope of health and life insurance coverage, and the amounts retirees who elect coverage will be charged. *See id.* at 58-60. As we have noted above, Article XX(6) includes the provision the Union alleges the Company has violated, which reads: "At retirement, eligible retirees will continue to participate in medical plans identical to those that are offered to active Employees . . . ." *Id.* at 58.

Second, both the text of the Agreement and the parties' course of dealing and performance confirm that a grievance need not be brought in the

20

name of one or more current employees. Although the preamble to Article XXII(1) refers in one clause to "the grievant," and although Step 1 (but not any of the subsequent steps) refers to "the aggrieved Employee," the article contains no language precluding the Union from bringing a grievance either in its own name or on behalf of a person, including a non-member, who is adversely affected by the Company's alleged failure to perform its obligations. *Id.* at 70. At Step 1 of the process outlined in Article XXII(1), "the [aggrieved] Employee's steward *and/or [Union] representative*" may submit a written grievance on an employee's behalf. *Id.* (emphasis added). Furthermore, Article XXII contemplates that the four-step grievance procedure applies "[s]hould [the Union] claim that a dispute or difference has arisen *between the Company and [the Union]* as to the meaning, application or operation of any provision of this Agreement." *Id.* at 70 (emphasis added). This plain language contemplates arbitration even if the Union merely claims a dispute exists between the Union and the Company, as entities, and by its express terms applies to any provision of the Agreement, which necessarily includes the provisions regarding retiree benefits. Moreover, there is evidence that the Union has, in its own name, previously filed grievances regarding benefits the Company agreed to provide retired employees. *See Tackett*, 574 U.S.

21

at 438-39 (allowing consideration of record evidence from outside the four corners of a collective bargaining agreement, in accord with "ordinary principles of contract law").  While the record of these earlier grievances -- two of which the Company rejected as "not arbitrable" -- is not unequivocally favorable to the Union, there is no evidence the Company refused to accept a grievance because it was filed by the Union, rather than by an employee.  J. App'x at 394, 399.

Third, even if it were necessary that a grievance be filed by a current employee, the grievance at issue in this case was submitted by Daniel Machold, who is both the Union's business representative and a Company employee.  He signed a "[s]ystem" grievance, affecting employees in "[a]ll" departments, concerning an alleged violation of Article XX.  *Id.* at 274.

For these reasons, we conclude that Article XXII unambiguously applies to the Union's grievance.  Because the article's scope is not ambiguous as to the parties' dispute, we need not apply the presumption of arbitrability or decide whether that presumption, if it applied, has been rebutted.  *See Granite Rock*, 561 U.S. at 301 & n.8.

## *CONCLUSION*

When it negotiated the Agreement, the Union bargained both for health insurance benefits for retired employees and for a grievance procedure that included, where necessary, access to arbitration. *See United Steel*, 710 F.3d at 475. We express no view on the merits of the Union's grievance; that is a question for the arbitrator. But interpreting the collective bargaining agreement in light of the principles the Supreme Court reaffirmed in *Granite Rock*, it is clear that the parties intended to arbitrate this dispute.

For the foregoing reasons, we AFFIRM the judgment of the district court.